IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JEFFERSON D. WALKER,  )   No. C 02-2458 JSW (PR)
                      )
        Petitioner,   )   **ORDER DENYING PETITION FOR**
                      )   **A WRIT OF HABEAS CORPUS**
    vs.               )
                      )
EDWARD S. ALAMEDA, Warden,  )
                      )
        Respondent.   )
_____)

## INTRODUCTION

Jefferson D. Walker, a state prisoner incarcerated at the California Training Facility, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the Court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## PROCEDURAL BACKGROUND

On May 4, 1982, Petitioner was convicted by a jury of first degree murder and solicitation of murder. The Superior Court of California, County of Alameda, sentenced Petitioner to twenty-five years to life in prison, concurrent with a sentence of four years. Ans. Ex. A.

On August 25, 1995, at his first parole suitability hearing, a panel of the Board of Prison Terms ("BPT") found Petitioner unsuitable for parole. His next parole hearing was deferred for four years. Petitioner's subsequent parole hearing was to be held on August 25, 1999, but was not held until May 23, 2000. At that hearing, the BPT panel again found Petitioner unsuitable for parole. *Id.* Ex. D. The BPT deferred the next parole hearing for a period of four years. *Id.* at 70-71. Petitioner filed an administrative appeal of the BPT decision, which was denied on the merits. Ans. Ex. B. Petitioner then

sought relief from the parole denial in the state courts.[1]  The California Supreme Court summarily denied his petition without citation or comment on April 17, 2002.  Ans. Ex. C.

Petitioner timely filed his federal the petition for writ of habeas corpus on May 21, 2002.  Following an order for amendment, Petitioner filed the first amended petition on June 25, 2002 (docket no. 3).  Judge Susan Illston issued an order to show cause on January 6, 2003 (docket no. 5).  On January 14, 2003, the petition was reassigned to this Court (docket no. 6).  On February 26, 2003, Respondent filed an answer (docket no. 7).  Petitioner filed a traverse (docket no. 8).[2]  On May 12, 2005, Petitioner filed a motion for discharge (docket no. 14), which the Court denied.  On July 26, 2005, the Court granted Respondent's motion for leave to file a supplemental answer (docket no. 15).[3]  The supplemental answer contains a motion by Respondent to dismiss the petition for want of federal subject matter jurisdiction.  On August 10, 2005, Petitioner filed an opposition to the supplemental answer.

---

[1]The Court notes that Respondent has submitted an incomplete copy of the petition filed in the state Supreme Court (docket no. 7; Ans. Ex. C.), and finds that this filing error causes no prejudice to Petitioner, as Respondent admits that "Petitioner sought relief from the parole denial in the California state courts, concluding with the California Supreme Court which summarily denied his petition on April 17, 2002." (Answer, ¶ 2.)  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.  *See* 28 U.S.C. § 2254(b), (c).

[2]Thereafter, on January 27, 2004, Petitioner moved this Court to grant him leave to file a supplemental brief to amend his petition to include an additional claim (docket no. 10).  The Court granted the request (docket no. 12.)  Subsequently, Petitioner withdrew his request to submit a supplemental brief (docket no. 13).  Accordingly, only the claims from the original petition are at issue.

[3]Respondent erroneously filed the supplemental answer electronically.  The Court's order directed respondent to file the supplemental answer manually within five days.  However, it appears Respondent did not do so because the Court's file does not contain those documents.  Therefore, the Court has relied upon the electronically filed documents to address the issue raised in the supplemental answer.

**STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U. S. 63, 70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry)  v. Taylor*, 529 U.S. 362, 412 (2000); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has repeatedly explained that AEDPA--which embodies deep-seated principles of comity, finality, and federalism -- establishes a highly deferential standard for reviewing state-court determinations. *See id.* at 436. Thus, the Court has emphasized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003)

3

(per curiam).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U. S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569, 578-79 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 3 (2002). The standard of review under AEDPA is somewhat different where the state court gives

4

no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice v. Collins,* 126 S. Ct. 969, 975 (2006). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeal, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under this standard, if the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Id.* at 787.

The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. *See Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *see also McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

5

**DISCUSSION**

I.      **Existence of a Federally Protected Liberty Interest in Parole**

The supplemental answer filed by Respondent on July 13, 2005, contains a motion to dismiss the petition on the ground that recent California Supreme Court authority interpreting California's parole scheme establishes that Petitioner has no federally protected liberty interest in parole and, therefore, the Court lacks jurisdiction over the matter.  Petitioner has filed an opposition to the motion to dismiss, arguing that Ninth Circuit precedent finding a protected liberty interest in California's parole scheme remains the applicable law.

In general, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7 (1979).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." *McQuillion*, 306 F.3d at 901 (citing *Board of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987)*; Greenholtz*, 442 U.S. at 12).

The California statutory provision at issue provides, in pertinent part, that "[t]he panel or the board, sitting en banc, *shall* set a release date *unless* it determines that the gravity of the current convicted offense or offenses ... is such that consideration of the public safety requires a more lengthy period of incarceration for this individual and that a parole date, therefore, cannot be fixed ... ."  Cal. Penal Code § 3041(b) (emphasis added). This "shall-unless" language is similar to the statutes that were at issue in *Allen* and *Greenholtz.  See Allen*, 482 U.S. at 376 ("*Subject to the following restrictions*, the board *shall* release on parole ... any person confined in the Montana state prison or the women's correction center ... when in its opinion there is reasonable probability that the

6

prisoner can be released without detriment to the prisoner or the community.") (quoting Mont. Code Ann. § 46-230201 (1985) (emphasis added and in original); *Greenholtz*, 442 U.S. at 11 ("[w]henever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release *unless* it is of the opinion that his release should be deferred because ... ") (quoting Neb. Rev. Stats. § 83-1,114(1) (1976)) (emphasis added).

Recognizing the similarity between California's statutory scheme and the statutory scheme at issue in *Allen* and *Greenholtz*, the Ninth Circuit has held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made." *McQuillion*, 306 F.3d at 902 (internal quotations and citations omitted). That court reiterated this holding in *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003) ("[I]t is clear that "California's parole scheme gives rise to a cognizable liberty interest in release on parole.") (quoting *McQuillion*, 306 F.3d at 902).

Respondent contends that the California Supreme Court's decision in *In re Dannenberg*, 34 Cal. 4th 1061 (2005), undermines the Ninth Circuit's holdings in *Biggs* and *McQuillion*, and Respondent relies on *Sass v. California Board of Prison Terms*, 376 F. Supp. 2d 975 (E.D. Cal. 2005), in support of this argument. This Court disagrees with the *Sass* court's conclusion that the holding in *Dannenberg* clearly demonstrates California's parole scheme is not mandatory. The issue presented in *Dannenberg* was whether the BPT was required to set uniform parole dates under section 3041(a) before it determined whether a particular inmate was suitable for parole under section 3041(b). *See Dannenberg*, 34 Cal. 4th at 1069, 1077. It concluded the answer to that question was no. *Id.* at 1096. However, the *Dannenberg* court used language throughout the opinion which suggests that it presumed an inmate retained a protected liberty interest in the

7

possibility of parole.  *See, e.g., id.* at 1094 (noting continued reliance on commitment offense "might thus also contravene the inmate's constitutionally protected expectation of parole"), 1095 n.16 ("well established principles" regarding parole discretion with deferential judicial oversight "define and limit the *expectancy* in parole from a life sentence *to which due process interests attach*").  Furthermore, California courts addressing the issue post-*Dannenberg* continue to assume a protected liberty interest exists.  *See In re Scott*, 133 Cal. App. 4th 573 (2005); *In re DeLuna*, 126 Cal. App. 4th 585 (2005).

Accordingly, this Court finds itself in agreement with a majority of courts that have considered the impact of *Dannenberg* on the issue presented by Respondent's motion and cannot find that the *Dannenberg* opinion represents a clear holding that California's parole scheme is not mandatory.  *See, e.g., Blankenship v. Kane*, 2006 WL 515627 at *3 (N.D. Cal. Feb. 28, 2006) (citing cases).  Accordingly, under the holdings of *McQuillion* and *Biggs*, Petitioner has a federally protected liberty interest in parole, the Court has jurisdiction over this matter, and Respondent's motion is denied.

## II.     The Requirements of Federal Due Process

Petitioner argues that the BPT's decision to deny him parole was arbitrary and capricious, and that the BPT's findings were unsubstantiated, thus violating his right to due process.  A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  *McQuillion*, 306 F.3d at 904 (adopting "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445 (1985)); *see also Biggs*, 334 F.3d at 915.  The evidence underlying the board's decision also must have some indicia of reliability.  *McQuillon*, 306 F.3d at 904; *Biggs*, 334 F.3.d at 915.  Most recently, in *Biggs,* the Ninth Circuit held that the some evidence standard may be considered in light of the board's decision-making process over time. *See id.* at 917 (concluding that "[a] continued reliance in the future on an unchanging

8

factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.").

**III.**     **Standards for Granting Parole to Convicted Murderers in California**

In order to determine whether there was some evidence to support the BPT's decision that Petitioner was not suitable for parole, the Court must look to the relevant California regulations.

California Penal Code section 3041(b) provides:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

California Code of Regulations, title 15 section 2402, sets forth the criteria for determining whether an inmate is suitable for release on parole. The opening paragraph of section 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Under section 2402(c), the listed circumstances tending to show *unsuitability* for parole include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> >
> > (C) The victim was abused, defiled or mutilated during or after the offense.
> >
> > (D) The offense was carried out in a manner which

9

demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Under section 2042(d), the listed circumstances tending to show *suitability* for parole include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with other.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

10

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9)  Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For first degree murders, the matrix of base terms ranges from the low of 25, 26, or 27 years, to a high of 31, 32, or 33 years, depending on some of the facts of the crime.[4] Although the matrix is to be used to establish a base term, this occurs only once the prisoner has been found suitable for parole.  *See id.* § 2403(a).  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  *Dannenberg*, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentencees should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration.  (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

--------

[4]One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture."  Each of the choices are further defined in the matrix.  See 15 Cal. Code Regs. § 2403(c).

11

*Id.* at 1070 (emphasis, brackets, and parentheses as in original).  In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually."  *Id. at* 1071.  The California Supreme Court's determination of state law is binding in this federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the  prisoner is laudable.  "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002), *cert. denied*, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

**IV.**   **Analysis**

A.   The Commitment Offense

The record before the Court does not contain a complete summary of the facts of Petitioner's commitment offense.  Accordingly, the Court takes judicial notice of the statement of facts by the California Court of Appeal in its published opinion affirming the judgment of conviction, *People v. Walker*, 145 Cal. App. 3d 886 (1983).

> In the early morning hours of June 7, 1981, Officers Seymour, Scott, and Weakland of the Livermore Police Department received a dispatch call to go to 341 Helen Way in Livermore.  When they arrived, appellant Jeff Walker met them at the front door and directed them to the master bedroom where his wife was injured and in need of medical attention. The officers went to the master bedroom where they found appellant's

wife, Susie Walker, lying on the bed with massive head injuries. Susie Walker was taken to the hospital by ambulance, underwent surgery, and was placed in the critical care unit in a coma. She remained unconscious for eight days and died on June 15, 1981.

Dr. Thomas Rogers, a forensic pathologist, performed an autopsy the following day. The autopsy showed a large number of injuries to the victim's head, body, and limbs. In his opinion, the cause of death was multiple blunt injuries to the head and neck caused by a blunt object. The injuries caused a swelling of the brain that in turn caused other bodily functions to cease.

After Susie Walker had been taken to the hospital by ambulance, Jeff Walker spoke with Officer Seymour of the Livermore Police Department. He told the officer that he had returned to their house with his wife and in-laws around 10:00 that night. He and his wife had gone to bed approximately [sic] 11:00. Approximately one hour later, he heard the stereo go off, and got up out of bed to investigate. He stated that when he got to the entrance way between the family room and living room, he was struck over the head two or three times but did not see who did it. When he woke up, he went to use the phone in the kitchen and found that the cord had been pulled from the receiver. He went into the bedroom and turned on the light to use the phone there and found his wife in bed in the condition that the officers found her in. Officer Seymour further testified that a window in the kitchen had been broken in.

Evidence Technician Gregory found that portions of the Walker's [sic] stereo system had been disturbed, that glass fragments from the broken window were found in the interior of the house, indicating that the window had been broken in from the outside, and that a small white plastic bindle was found on the floor of the living room, directly underneath a portion of the stereo. Crime Lab Technician Dorothea Bernard performed an analysis of the contents in the bindle and testified that the white powder contained methamphetamine. The scene of the household as found by the Livermore police officers, and the injuries suffered by the victim Susie Walker, appeared to be connected with a burglary of the Walker residence.

After continuous investigation by the Livermore Police Department, [Walker] was arrested for the murder of his wife in August 1981. While he was being held at Santa Rita between August 24 and 26, he had conversations with his cellmate, Mr. Charles Bell. According to Mr. Bell's testimony at the preliminary hearing, [Walker] solicited Mr. Bell to murder a potential witness against [Walker], a Mr. Tommy Lee Olsen. [Walker] was released from Santa Rita approximately August 26 and was not charged with any crimes, apparently due to insufficient evidence and a hearsay problem. [Walker] retained his trial attorney on the same date that he was arrested. On that date, [Walker's] counsel contacted a member of the district attorney's office as well as the investigating members of the Livermore Police Department to inform him of his representation of Walker.

After Walker was released from Santa Rita without being charged, he returned to the jail to visit Mr. Bell.  According to Mr. Bell, they discussed the agreement for Bell to murder witness Olsen.  Two days after that visit, [Walker] once again visited Bell at Santa Rita and again briefly discussed the deal.  However, prior to this visit, Bell contacted police authorities and informed them about Mr. Walker's solicitation of him for murder.  It was then arranged that Bell would telephone [Walker] at his home and that the conversation would be tape recorded with the consent of Bell and unknown to Walker.  The contents of that tape recording, and Bell's testimony from the preliminary hearing was the sole evidence against [Walker] regarding the charge against [Walker] that he solicited Bell to commit the crime of murder.  Although Bell had never been asked to inform on cellmates or other prisoners before, after he was seen visiting with Mr. Walker after Mr. Walker's release, he was approached by authorities that if he had any information to tell the police about Walker, he should go ahead and tell them.  Bell was promised by the authorities, at their suggestion, that if he was later convicted on the crime for which he was being held, they would do all they could to have him serve the time outside of the State of California due to Bell's falsely wearing a 'snitch jacket.'  Despite that label, Bell insisted that he had never informed on anyone before.

Charles Bell refused to testify at the trial of [Walker].  He refused to make any comment as to why he would not do so.  The court demanded that he testify, but Bell refused even after immunity was given him.  The court initially indicated that it would hold Bell in contempt but later admitted that such sanction was not much of an inducement for him to testify since he was facing a possible 60 years in prison for pending criminal accusations.

***

At trial, the prosecution put on numerous witnesses, including Tommy Lee Olsen, a close friend of Walker's.  Olsen testified that on numerous occasions during the weeks preceding the attack on the victim, [Walker] discussed with him his plans and desire to do away with his wife.  Olsen further testified that he went to [Walker's] house on the evening of the attack, helped Walker make the residence look like the scene of a burglary by carrying away valuable property and leaving a bag of methamphetamine on the floor, and that he hit or struck [Walker] several times on the head and chest.

[] Walker testified at trial in his own behalf.  He told the jury about his early childhood, including the death of his father in an industrial accident when he was five years old.  He had a religious upbringing and training, and slept in the same room as his mother, who never remarried, until he was ten years old.  He had met and married Susie Walker at a fairly early age and in fact had not had sexual relations with any other woman prior to his marriage.  The great bulk of his testimony related to his relationship with his wife, in which it was indicated that he was compelled to give up dancing, hobbies, etc. due to the wishes of his wife.  She controlled everything and was obsessed with her appearance and

14

perfectionism.  He eventually reached the conclusion that all other options to end the relationship were unworkable and it was either suicide or murder.  He admitted administering the severe beating of his wife with a heavy lead fishing weight, and testified to his state of mind as being that of intense anger at the time of the commission of the crime.  The gist of [Walker's] testimony as well as that of the other defense witnesses was to the effect that Walker was an emotionally battered husband and that his mind formulated the thought that his only option to end the repressive situation he found himself in was murder.  In his final argument, defense counsel argued the existence of the emotionally battered psychological state of mind of [Walker] and that Walker did not and could not have deliberated the act of murder at the time that it was committed.

145 Cal. App. 3d at 890-93.

The appellate opinion also contains the following colloquy from Walker's cross-examination by the prosecutor regarding Walker's admission that he had, over a long period of time, deliberated the murder of his wife:

Q:  You had previously considered getting a divorce?

A:  Yes.

Q:  And you previously considered leaving her?

A:  Yes.

Q:  And you previously considered suicide?

A:  Yes.

Q:  You rejected all those?

A:  When I – At the point when I decided it was suicide, I made the decision it was either her or me, and that I chose her, and after that I didn't look back.

Q:  You thought about it, and you decided one of us is going to die, and it's not going to be me?

A:  Yes, that's true.

Q:  And you decided that your life was more valuable than hers?

A:  I guess it was out of selfish motives, yes.

Q:  And you killed her for selfish motives?

A:  Yes.

15

Q:  You killed her because you wanted to live and that meant she had to die?

A:  Yes . . . I wanted my freedom, yes . . .

Q:  You wanted your freedom to do what?

A:  I just wanted to be able to do what I wanted to, whatever that might be, make my own decisions, buy my own clothes, have money in my pocket, go where I wanted to go when I wanted to go.

Q:  You decided that not only were you going to murder your wife but you were going to cover it?

A:  Yes.  When I decided that I was going to do it, I had – I wanted to cover it.

Q:  You wanted to get away with it?

A:  Yes.

Q:  You didn't want to pay any price?

A:  Anybody that do something like that would want to get away.  It's a natural condition.

Q:  That's not my question.  You wanted to get away?

A:  Yes.

Q:  You didn't want to pay the price?

A:  No, I didn't.

Q:  You didn't want to accept responsibility for it?

A:  No, I didn't.

Q:  You decided to cover it up?

A:  Yes, I did.

Q:  You decided to make it look like a burglary?

A:  Yes, I did.

Q:  You decided to mislead and lie to everybody close to you, the entire community, and to the police?

A:  Yes, I did, including my church.

Q:  You decided to make it look like people that used dope did it;

16

1  correct?

2  A:  Yes.

3  Q:  And you thought that would mislead the police?

4  A:  Yes.

5  Q:  And you considered how you were going to mislead the police, didn't
   you?

6

7  A:  I just put the – planted the dope there, and whatever they took off was
   theirs.

8  Q:  But you thought about how you were going to get away with this?

9  A:  I thought that would get me away with it, yes.

10  Q:  You thought that making it look like a burglary would help your
    getting away with it?

11

12  A:  Yes.  I thought making it look like a burglary would help me get
    away.

13  Q:  You thought planting the dope would help you get away?

14  A:  Yes.  I thought that that would help or they'd be looking for
    somebody that used these . . .

15

16  Q:  And you decided to gather up property to make it look like a burglar
    had taken property?

17  A:  After he got there, yes.

18  Q:  And you picked June 6, 1981, didn't you?

19  A:  Yes.

20  Q:  You planned that date in advance?

21  A:  Yes, I did.

22  *Id. at* 898-900.

23  B.    Petitioner's Prior Parole-Related Proceedings

24  The following facts are derived from Petitioner's traverse and the exhibits

25  submitted in support thereof.  Petitioner was first seen by the BPT for a parole

26  recommendation hearing on April 11, 1983, at which time his personal history and

27

28  17

offense were reviewed and recommendations made which would be revisited by the BPT panel for compliance at his initial parole hearing under California Penal Code section 3041(a).  Because Petitioner had employable skills as a journeyman gas and diesel mechanic, there was no recommendation made for vocational training.  It was recommended that Petitioner upgrade educationally, which Petitioner was in the process of doing, and that he enroll in therapy, which he also was doing.  Petitioner was seen by the BPT for his first documentation hearing in July 1985, and a psychological evaluation was prepared for that hearing by Dr. Elem.  At that time, the severity of the stressors at the time of the offense was noted as "extreme."  At the documentation hearing, no recommendation was made by the BPT for vocational training; it was recommended that Petitioner continue his college education, positive work efforts, and therapy, and it was noted that a "positive psychological evaluation" is, generally, necessary to be granted parole.  Petitioner's second documentation hearing was held on July 25, 1988.  Another psychological evaluation was prepared, by Dr. Hodges, in which it was noted that Petitioner's "'acting out' tendencies, a measure of violence potential, is well within the normal limits."  Also, that Petitioner had "made significant and lasting personality changes during his incarceration.  Such changes are suggestive of an excellent parole candidate with low violence and alcohol abuse potential."  Trav. Ex. 8.  No recommendations were made by the BPT except for Petitioner to continue programming in the positive manner he had to date.  Trav. Ex. 7.

Petitioner's third documentation hearing was held on July 7, 1991.  Trav. Ex. 9. A psychological evaluation was prepared by Dr. Tolchin.  Although Dr. Tolchin noted that Petitioner needed therapy to extricate himself emotionally from his dead wife, Dr. Tolchin nonetheless concluded: "This inmate will never again pose a threat to society and, once released, will resume his life as a productive citizen."  Trav. Ex. 10.  The BPT noted that Petitioner had received his bachelor's degree and participated in group therapy

18

and psychiatric treatment, and his "excellent" behavior.  No recommendations were made.

Petitioner's initial parole hearing was held on August 15, 1995.  At that time, Petitioner's minimum eligible parole date was set at June 4, 1996.  For this parole hearing, a psychological evaluation was prepared by Dr. O'Meara, who wrote as follows regarding the insights gained by Petitioner into the commitment offense:

> [Walker] reflects back on [his relationship with his wife] and sees the insidious development of a lopsided marriage where his wife became increasingly controlling and domineering.  Rather than asserting his dissatisfaction with her authoritarian behavior, he submitted to her demands. . . . He had no skills for a healthy catharsis for his resentment and anger.  He felt increasingly frustrated, helpless, and depressed.  Thoughts of suicide were entertained.  He recalls feeling like he psychologically "snapped."  Remorse for the offense appears genuine.  He speaks of the victim in a sincere manner. . . . [H]e has considerably above average personal insight.  He appears to have gained a lot from his many years of therapy.  Psychological insights seem well integrated into his personality and given this, it is likely that he will maintain the gains he has achieved in therapy.

> There is no indication of any signs of poor judgment or weakened impulse control.  He is pro-social and conforming.  This is underscored by his lack of disciplinaries during the entirety of his incarceration.

> Diagnostic impression reveals no mental illness or disorder.  By history he has had one explosive episode. . . . He seems to have made considerable progress in altering personality pathology.  Drugs or alcohol have not played any significant role in his functioning.

> . . . He has made maximum use of psychotherapy and self-help.  Violence potential is below average.

Trav. Ex. 12.

The BPT denied parole.  The reasons stated were:

(1)  The commitment offense was cruel, callous, brutal, dispassionate, planned, showed a total disregard for the suffering of another;

(2) The prisoner has no history of violent behavior or criminality, which relates to the unpredictability of the prisoner;

(3) The panel finds that the prisoner needs therapy in order to discuss, understand and cope with the life offense, and until progress is made, he continues to be unpredictable and a threat to others;

(4) The prisoner has not had sufficient participation in substance-abuse programming;

(5) The prisoner shows no evidence of remorse and shows little insight into the commitment offense;

(6) He tended to minimize his act of soliciting to have his crime partner killed.

Trav. Ex. 3 at 67-69.  Petitioner's next parole hearing was deferred for four years.

C.    Petitioner's May 23, 2000 Parole Hearing

The hearing at issue in the present petition was held on May 23, 2000.  Petitioner appeared before the BPT panel in pro per.  At the hearing, the commissioners noted that since his last hearing Petitioner had become a certified paralegal, completed a recovery addiction program, and participated in therapy.  In addition, the psychological evaluation prepared for the hearing by staff psychologist Dr. Reed was summarized as follows by Commissioner Bordonaro:

> Under assessment of dangerousness the doctor says that on one hand he has no prior criminal history.  He has received no CDC 115s [rules violation reports], only one CDC 128 [custodial counseling chrono] during his 17 years of incarceration.  He has never received a disciplinary for violent behavior.  On the other hand, . . . he talks about that your violence potential within a control [sic] setting is significantly below the average level II inmate, and basis [sic] that on your institutional behavior. And then he says, "Therefore, in light of these factors, his violence potential is considered to be significantly below average."  . . . And then [], he says that, "If released to the community his violence potential is considered to be no more than the average citizen in the community." And it says that there are no significant risk factors which may be precursors to violence for this individual.  Again, that's signed by Joe Reed, Ph.D., staff psychologist.

Ans. Ex. D at 35.

Letters of three offers of employment and housing were offered into the record by Petitioner, including one from his son.  Petitioner also spoke about the fact that he had maintained relationships with his sons since his incarceration, and with other family and community members.

The BPT denied parole.  The decision was relayed by Presiding Deputy

20

1   Commissioner Carol Bentley as follows:

2   COMMISSIONER BENTLEY:  Mr. Walker, the Panel has reviewed all the information we've received from the public and we've determined

3   that you're not suitable for parole and that you'd pose an unreasonable risk or danger to others.  This is a unanimous decision.  And it's based

4   first of all on the commitment offense, which was just a horrible crime, something I cannot fathom how a person can live with a woman, make

5   love to a woman for at least 17 days all while he's plotting on killing her. And then we come to the actual night of the killing where you made love

6   to her and then a short time later ended up bludgeoning her with a weight resulting – and then making her unconscious.  And then this criminal act,

7   awful as it was, didn't stop you from going on and committing other crimes, and that was solicitation for the murder of [Tommy Olsen]. . . .

8   [by Mr. Bell].

9   We find in prison, as would be expected from your background, you've been doing a good job.  You've been working, getting good work reports.

10   You've been disciplinary free.  You've upgraded educationally.  You've also assisted others in the prison situation.  However, these positive

11   factors do not outweigh those factors of unsuitability.  This denial is for four years.  We don't think it's likely a hearing Panel would find you

12   suitable for parole during the following four years.  This, again, is a separate decision.  It's based on the very callous, extremely callous,

13   manner in which you could plot and take the life of your wife.  And it's also based on your following criminality, the solicitation for the murder.

14   The Panel is basing this decision of course on the crime.  And then also, it's very obvious from this hearing today you do need more time in some

15   sort of self-help, some sort of self-study that would enable you to gain more insight into these criminal activities.  You've spent most of this

16   time mitigating the whole crime.  I couldn't believe you had the audacity to sit there and say that, "I did, I bludgeoned her, but then I stopped and

17   called for help."  Which isn't the case at all.  I'm quite sure you thought she was dead, and you didn't stop –

18

19   INMATE WALKER:  I knew she was not dead.

20   COMMISSIONER BENTLEY:  Don't interrupt me.  You didn't stop and call for help.  You went ahead with [Olsen] and did the rest of the

21   burglary scene, and then had him knock you out.  Your insight is extremely poor and we believe that this would make you a risk if released

22   to society.  I'm go[i]ng to recommend that you of course become disciplinary-free, you continue your good programming, find some self-

23   study or self-help programming.

        ***

24

25   INMATE WALKER:  Could you recommend what self-help is available.

26   COMMISSIONER BENTLEY:  I'm just saying that maybe you can do some on your own like you did your paralegal.  Maybe you can find some

27   books or something that's going to give you some more insight into this.

28                                              21

1    This hearing is concluded.  Here's your paperwork,

2    INMATE WALKER:  Thank you.  I'm sorry I angered you so much
     personally, Ms. Bentley.

3

4    COMMISSIONER BENTLEY:  No, I'm not angry.

5    INMATE WALKER:  Well, I could tell when you –

6    COMMISSIONER BENTLEY:  Okay.  This hearing is concluded and
     I'm not angry.

7    INMATE WALKER:  I know.

8    Ans. Ex. D at 70-73.

9          D.    Whether Some Evidence Supports the BPT's Decision

10         The BPT denied parole based on its conclusion that Petitioner presented an

11   unreasonable risk or danger to others based on the nature of the commitment offense,

12   including his solicitation of murder subsequent to the initial offense, and Petitioner's

13   need for more therapy or self-help programming.  As discussed below, the Court finds

14   that the BPT's reliance on the nature of the offense to deny parole was supported by

15   some evidence, but its finding that Petitioner must participate in further therapy or self-

16   help programming in order to be found suitable for parole was not.  Because reliance on

17   the nature of the crime is sufficient in and of itself to deny parole under California law,

18   however, the BPT's decision to deny parole is not devoid of the quantum of some

19   evidence required to satisfy due process.

20         1.    The nature of the offense

21         One of the factors that the BPT can consider in denying parole is that the offense

22   was committed in an "especially heinous, atrocious or cruel manner."  15 Cal. Code

23   Regs. § 2042(c)(1).  This includes consideration of whether "[t]he offense was carried

24   out in a manner which demonstrates an exceptionally callous disregard for human

25   suffering."  The BPT denial of parole was based "on the very callous, extremely callous,

26   manner in which you could plot and take the life of your wife.  And it's also based on

27

28                            22

1    your following criminality, the solicitation for the murder." Ans. Ex. D at 71.

2            This Court must consider whether there was some evidence to support this

3    finding and concludes that there was.  Petitioner planned the murder for seventeen days.

4    On the night of the murder he had sexual relations with his wife.  Shortly thereafter he

5    struck her on the head ten to twelve times with a fishing weight.  He then "grabbed her

6    from behind and gave her a chop to the back of the neck and knocked her out." *Id.* at 19.

7    Knowing that she was unconscious and suffering from massive head injuries, Petitioner

8    nevertheless proceeded to stage the house as if a burglary had occurred, including having

9    Tommy Olsen physically assault him.  Petitioner did not come forward and admit his

10   involvement while his wife lay in a coma for eight days before she died, nor did he do so

11   when he was arrested three months later.  After being released because of insufficient

12   evidence to charge him he solicited another inmate, Mr. Bell, to kill his crime partner,

13   Tommy Olsen.  It was only because Mr. Bell informed the police of the solicitation and

14   the police recorded a conversation between Mr. Bell and Petitioner, that Petitioner could

15   no longer deny his involvement in his wife's murder.  He later was convicted of the

16   crime of soliciting murder, as well.

17           Petitioner's actions in committing the offense were beyond the minimum

18   elements necessary to constitute first degree murder.  Thus, the Court finds that the

19   BPT's decision to deny parole by relying on the facts of the crime are based on some

20   evidence, *see Dannenberg*, 34 Cal. 4th at 1071 (the BPT can use the facts of the crime

21   alone to deny parole if it can point to factors beyond the minimum elements of the crime

22   for which the inmate was committed), and the state Supreme Court's rejection of

23   Petitioner's claim for habeas corpus relief on this ground was not based on an

24   unreasonable determination of the facts in light of the record. *See* 28 U.S.C.

25   § 2254(d)(2).

26   //

27

28                                                                23

2.   <u>The need for further therapy or self-help programming</u>

One of the factors the BPT can consider to determine unsuitability for parole is whether the prisoner "has a lengthy history of severe mental problems related to the offense." 15 Cal. Code Regs. § 2042(c)(5).  Similarly, one of the factors the BPT can consider to determine parole suitability is evidence that "[t]he prisoner [has] performed acts . . . indicating that he understands the nature and magnitude of the offense." *Id.* § 2042(d)(3).  The Court finds that the BPT's determination that Petitioner requires further therapy or self-help programming in order to qualify for parole is not based on some evidence.

As discussed in detail above, Petitioner began participating in therapy in 1983 and has done so throughout his term of incarceration.  Since 1988 Petitioner's psychological evaluations consistently have noted his increasing insight into the circumstances which led him to murder his wife and a concomitant decreasing potential for violence.  At his 2000 parole hearing Petitioner testified that after his prior hearing in 1995, where it was recommended that he participate in more therapy, he met with two therapists, both of whom found that he had no further need for therapy.  The BPT also acknowledged that Dr. Reed, who psychologically evaluated Petitioner for the present hearing, agreed with that assessment.  In a further attempt to comply with the BPT's prior recommendation Petitioner also participated in a "twelve step" drug and alcohol rehabilitation program, even though it is clear from the record of the hearing that Petitioner never had a drug or alcohol problem.  Even so, he testified to insights he has gained about himself and the commitment offense from that participation.  The record contains abundant evidence of Petitioner's participation in therapy and self-help programming, *see e.g.,* Trav. Ex. 11 (between 1983 and 1993 Petitioner completed no less than twenty-two group and individual therapies and other self-help programs), as well as the undisputed statements of mental health experts that Petitioner understands the

1    nature and magnitude of the commitment offense, that he is below average in future

2    potential for violence, and that he no longer is in need of therapy.

3        The lack of evidentiary support for the BPT's finding is highlighted further by

4    Commissioner Bentley's answer to Petitioner's question at the end of his hearing as to

5    what further self-help programming she could recommend for him.  Rather than provide

6    Petitioner with concrete options that would be available to an inmate whom the BPT's

7    own staff psychologist has found no longer to be in need of therapy, and who had

8    participated in the available self-help programs, she replied: "I'm just saying that maybe

9    you can do some on your own like you did your paralegal.  Maybe you can find some

10   books or something that's going to give you some more insight into this."  Ans. Ex. D at

11   72.  Based on this response, it seems unlikely that Petitioner ever would be able to

12   overcome the BPT's finding that he had not participated in sufficient therapy or self-help

13   programming to be found suitable for parole.

14       Accordingly, the Court finds that the BPT's determination to deny Petitioner

15   parole on this ground was not based on some evidence, and the state Supreme Court's

16   rejection of this claim was based on an unreasonable determination of the facts in light of

17   the record.  As noted above, the BPT's decision to deny parole on this ground does not

18   entitle Petitioner to habeas corpus relief because the BPT's reliance on the nature of the

19   crime is sufficient in and of itself to meet the some evidence standard and deny parole

20   under California law .

21           E.    Whether the BPT's Reliance on the Unchanging Facts of the
                   Crime Violates Due Process
22

23       Having found that the only factor the BPT relied upon to deny Petitioner parole

24   which was supported by some evidence was the nature of the commitment offense, the

25   Court now turns to the question whether the BPT's sole reliance on the unchanging facts

26   of the crime amounts to a violation of due process.  In *Biggs v. Terhune*, 334 F.3d 910

27   (2003), the Ninth Circuit indicated that a continued reliance on an unchanging factor

28                                        25

1   such as the circumstances of the offense could result in a due process violation.  Biggs

2   was serving a sentence of twenty-five years to life following a 1985 first degree murder

3   conviction.  In the case before the Ninth Circuit, Biggs challenged the 1999 decision by

4   the BPT finding him unsuitable for parole despite his record as a model prisoner.  334

5   F.3d at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for

6   finding Biggs unsuitable, it upheld three: (1) the commitment offense involved the

7   murder of a witness, (2) the murder was carried out in a manner exhibiting a callous

8   disregard for the life and suffering of another, and (3) Biggs could benefit from therapy.

9   *Id.*  However, the Ninth Circuit cautioned the BPT regarding its continued reliance on the

10   gravity of the offense and Biggs's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on
> the gravity of the offense and conduct prior to imprisonment to justify
> denial of parole can be initially justified as fulfilling the requirements set
> forth by state law.  Over time, however, should Biggs continue to
> demonstrate exemplary behavior and evidence of rehabilitation, denying
> him a parole date simply because of the nature of his offense would raise
> serious questions involving his liberty interest.

15   *Id.* at 916.

16          Thus, the Ninth Circuit concluded that "[a] continued reliance in the future on an

17   unchanging factor, the circumstance of the offense and conduct prior to imprisonment,

18   runs contrary to the rehabilitative goals espoused by the prison system and could result in

19   a due process violation."  *Id.* at 917.  The Ninth Circuit did not specify what number of

20   hearings or years might constitute the requisite length of time to find that continuing

21   reliance on an unchanging fact to deny parole amounts to a violation of due process, nor

22   has it since.  Neither have the district courts which have addressed challenges to the

23   denial of parole based solely on the commitment offense.  In cases similar to *Biggs*,

24   however, where the denial of parole was made at the petitioner's first parole suitability

25   hearing, or at the first parole suitability hearing where the BPT relied solely on the facts

26   of the commitment offense to deny parole, no due process violation has been found

27

28                                              26

because there was some evidence to support the BPT's finding and *Biggs* has not been addressed, *see, e.g., Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (denial of parole at first parole suitability hearing); or no due process violation has been found because there was some evidence to support the BPT's finding and the circumstances have been found not to rise to the level of the concerns raised in *Biggs*, *see, e.g., Hudson v. Kane*, 2005 WL 2035590, *9-10 (N.D. Cal. Aug. 23, 2005) (denial of parole at third parole suitability hearing, but first denial based solely on the facts of the commitment offense).

In contrast, in those cases where the petitioner has had several parole suitability hearings over a long period of time and the BPT panel relied solely on the commitment offense to deny parole, a violation of due process and entitlement to relief under *Biggs* has been found. *See, e.g., Irons v. Carey*, 358 F. Supp. 2d 936, 947 (2005) (finding due process violation in denial of parole at fifth parole suitability hearing after petitioner had served sixteen years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole), *appeal docketed*, No. 05-15275 (9th Cir. Feb. 17, 2005); *Johnson v. Finn*, 2006 WL 195159, *12 (E.D. Cal. Jan. 19, 2006) (finding due process violation in denial of parole at twelfth parole suitability hearing after petitioner had served twenty-four years of sentence of life with the possibility of parole and met circumstances tending to indicate suitability for parole); *Masoner v. State*, No. CV-03-1261-ER (C.D. Cal. Jan. 23, 2004) (finding due process violation based on BPT's "continued reliance" on pre-conviction factors to justify denial of parole suitability after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder, had participated in therapy and self-help programming and had impeccable prison record).

The Court finds that Petitioner's case here more closely resembles the facts of *Biggs* than it does those cases where a due process violation has been found. At the time

of his May 23, 2000 parole denial, Petitioner had served eighteen years of a twenty-five years to life sentence, had only had one previous parole suitability hearing, and the denial of parole suitability at the first hearing had been based on grounds in addition to the nature of the commitment offense.  While the Court can envision that at some point the facts of Petitioner's case will more resemble those cases where relief has been granted than not, at this time the Court does not find that the BPT's reliance solely on the nature of the offense in denying Petitioner parole at his 2000 hearing violated his federal due process rights.  Accordingly, this claim for relief is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk of the court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: <u>March 30, 2006</u>

_____
JEFFREY S. WHITE
United States District Judge